THE HONORABLE_____

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DAVITA INC.,

                        Plaintiff,

    v.

VIRGINIA MASON MEMORIAL HOSPITAL, f/k/a YAKIMA VALLEY MEMORIAL HOSPITAL and YAKIMA VALLEY MEMORIAL HOSPITAL EMPLOYEE HEALTH CARE PLAN,

                        Defendants.

Case No. 2:19-cv-302

**COMPLAINT**

### NATURE OF ACTION

1. Plaintiff DaVita Inc. ("DaVita") provides life-sustaining dialysis treatment to beneficiaries of Defendant Yakima Valley Memorial Hospital Employee Health Care Plan ("Yakima Valley Plan" or "Plan") who suffer from end-stage renal disease ("ESRD"). Also known as kidney failure, ESRD is the last stage of chronic kidney disease. When a patient suffers from ESRD, it means their kidneys have stopped working well enough for the patient to survive without dialysis or a transplant.

PLAINTIFF'S COMPLAINT - 1
CASE NO. 2:19-cv-302

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

2. Individuals with ESRD are entitled to Medicare regardless of age or financial status. Congress added this benefit by amending the Social Security Act in 1972, recognizing the toll kidney disease was taking on its sufferers.[1] This change led private payers to push the cost of treating ESRD sufferers onto Medicare—meaning the federal fisc bore virtually the entire weight of treating ESRD. The Medicare Secondary Payer Act (MSPA) inverted this status quo. It made "private insurers . . . the 'primary' payers and Medicare the 'secondary' payer" during an individual's first 30 months of ESRD-based Medicare eligibility. *Bio-Medical Applications of Tenn. v. Cent. Sts. Se. & Sw. Areas Health & Welfare Fund*, 656 F.3d 277, 278 (6th Cir. 2011).

3. The MSPA accomplishes this goal by prohibiting primary payers, like the Plan here, from taking steps to prematurely shift ESRD individuals to Medicare. To that end, the Act prohibits two types of practices: First, the Act precludes plans from "tak[ing] into account that an individual is entitled to or eligible for" Medicare benefits due to ESRD during the 30-month coordination period. 42 U.S.C. § 1395y(b)(1)(C)(i). Second, it makes clear that a plan may not "differentiate in the benefits it provides" between individuals with ESRD and others "on the basis of the existence of end stage renal disease, the need for renal dialysis, or in any other manner." *Id.* § 1395y(b)(1)(C)(ii).

4. Defendants have violated both prohibitions, by providing a separate, and lesser, set of benefits for outpatient kidney dialysis for treatment of ESRD. The Plan covers outpatient kidney dialysis for patients without ESRD in the same manner as many other medical treatments. In contrast, there is a special Plan provision for patients who need kidney dialysis to treat their ESRD. Only when a "member becomes, or is eligible to become, qualified for Medicare coverage for ESRD and Medicare becomes or is eligible to become the secondary payer for ESRD services, the

---

[1] *See, e.g.,* S. Rep. 92-1230 at 1243-44 (citing need to provide access to treatment in order to reduce direct health care costs, avoid "lost future income," and prevent "needless deaths" caused by kidney disease), *available at* https://www.ssa.gov/history/pdf/Downey%20PDFs/Amendments%20to%20the%20Social%20Security%20Act%201969-1972%20Vol.%203.pdf.

PLAINTIFF'S COMPLAINT - 2
CASE NO. 2:19-cv-302

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Plan will pay claims for ESRD services at 125% of the then current Medicare allowable for ESRD Services." As a result, the Plan both takes into account the fact that a participant is entitled to or eligible for Medicare due to ESRD and explicitly differentiates in the benefits it provides to Medicare-eligible ESRD sufferers.

5. This is not only illegal, it is unsustainable and unfair. Neither DaVita nor any other dialysis provider can treat Yakima Valley Plan beneficiaries indefinitely without receiving appropriate compensation. Defendants' actions create significant risk that providers may choose not to treat Plan beneficiaries at all, or their actions may force providers to bill patients for the shortfall between the Plan's improperly low rate and the rates providers typically receive from private payers. Defendants have thus jeopardized the lives and livelihoods of the Plan's most vulnerable beneficiaries.

6. Moreover, Defendants' improper singling out of ESRD patients creates dramatic incentives for them to drop out of the Plan altogether and instead rely on Medicare. The reason why is simple: their Medicare payment obligations would be significantly lower than the obligations and risks that the Plan exposes them to. And indeed, at least one Plan beneficiary with ESRD has left the Plan for Medicare. To be sure, this accomplishes Defendants' goal of saving money on dialysis, but such "shifting of costs from private plans to the public fisc was exactly the evil that the Act sought to correct." *Bio-Medical Applications*, 656 F.3d at 282-83. DaVita—both as assignee of at least one Plan beneficiary and in its own right—accordingly seeks relief under federal law.

**JURISDICTION AND VENUE**

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

8. This Court has personal jurisdiction over Defendants because Defendants are incorporated in and/or maintain their principal places of business in the State of Washington.

PLAINTIFF'S COMPLAINT - 3
CASE NO. 2:19-cv-302

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

9.     Venue is proper in this district because Defendants are residents of the Western District of Washington, and a substantial part of the events giving rise to this action occurred in this District. 28 U.S.C. § 1391.

10.    The Plan contains a venue provision which states that "[i]n all suits or legal proceedings brought by the Plan or brought against the Plan, venue may lie, at the Plan's discretion, in King County, state of Washington."

## PARTIES

11.    DaVita is a Delaware corporation with its principal place of business in Denver, Colorado. It is a leading provider of kidney care in the United States with over 2400 centers across the country, including 118 facilities in Washington. As set forth below, DaVita sues both in its own right and as an assignee of its patients.

12.    On information and belief, Defendant Virginia Mason Memorial Hospital f/k/a Yakima Valley Memorial Hospital ("Hospital") is a nonprofit organization with its principal place of business at 2811 Tieton Drive, Yakima, Washington. The Hospital is the sponsor, plan administrator, and a fiduciary of the Yakima Valley Plan. The Hospital is the Plan-designated agent for service of process.

13.    On information and belief, effective January 1, 2016, the Hospital merged with the Virginia Mason Health System (the "Health System"), a nonprofit corporation incorporated in the State of Washington and headquartered in Seattle. As a result of the merger, the Health System became the parent company of the Hospital.

14.    Defendant Yakima Valley Plan is an "employee welfare benefit plan" and an "employee benefit plan" within the meaning of ERISA. *See* 29 U.S.C. § 1002(1) (defining "employee welfare benefit plan" and "welfare plan"); 29 U.S.C. § 1002(3) (defining "employee benefit plan" and "plan"). Its principal place of business is at 2811 Tieton Drive, Yakima, Washington. Participation in the Plan is reserved to eligible members, retirees, and their

PLAINTIFF'S COMPLAINT - 4
CASE NO. 2:19-cv-302

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

dependents, and the purpose of the Plan is to provide them with medical and health benefits. The Plan is funded by the general assets of the sponsor and by insurance.

15. The Plan utilizes First Choice Health Administrators ("First Choice"), a Seattle-based provider of health plan administration and other related services, as a third-party administrator.

## GENERAL ALLEGATIONS

### I.  DaVita Provides Life-Sustaining Dialysis Treatment.

16. Kidney failure, also called ESRD, is the last stage of chronic kidney disease. When a patient suffers from ESRD, it means that their kidneys have stopped working well enough for the patient to survive without dialysis or a kidney transplant.

17. Dialysis is a procedure used to "substitute" for many of the normal functions of the kidneys, such as removing the waste products that the body produces throughout the day. When these toxins are not removed on a regular basis (typically three times per week), they build up in the body and cause serious health complications and ultimately death. As a result, ESRD sufferers—whose kidneys can no longer perform these crucial functions—cannot survive without a dialysis or a kidney transplant.

18. Although hemodialysis is the most common treatment for people with ESRD, it is far from a routine medical procedure. A dialysis machine removes blood from the body, filters it through an artificial kidney, and then returns the cleaned blood. Traditional, in-center dialysis is administered to a patient three times a week for about four hours each session.

19. ESRD affected more than 787,000 people in the United States as of 2016, and the number of patients diagnosed with ESRD continues to rise each year. U.S. Renal Data System, *2018 USRDS annual data report: Epidemiology of kidney disease in the United States*, National Institutes of Health, National Institute of Diabetes and Digestive and Kidney Diseases, Bethesda, MD, 2018 ("2018 NIH Report"), Table B.1.

PLAINTIFF'S COMPLAINT - 5
CASE NO. 2:19-cv-302

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

20. As of 2016, the total annual hemodialysis cost in the United States was over $70 billion. *Id.* Tables B.1 & K.7.

21. Congress and regulators have recognized that dialysis is essential. For example, Medicare Part B covers routine maintenance dialysis for people with ESRD regardless of their age or financial resources. In 2016, Medicare spent over $35.3 billion on services for beneficiaries with ESRD. *Id.*

22. DaVita is a leading provider of this care in the United States. It treats almost 200,000 patients at over 2,400 centers across the country. In 2017, Fortune named DaVita one of the world's most admired companies for the tenth consecutive year—and the number one healthcare company for quality of service.

## II. The Yakima Valley Plan, By Design And Plain Language, Discriminates Against ESRD Sufferers.

23. On information and belief, the Yakima Valley Plan provides four different coverage "tiers," which vary based on the relationship between the Plan and the provider used by the beneficiary.

24. To receive the highest level of benefit coverage, beneficiaries must obtain services from providers in certain specified networks. Tiers 1 through 3 provide different levels of "network" (or "in-network") coverage for healthcare services. The distinctions between Tiers 1, 2, and 3 are not relevant for this lawsuit. What matters is that for all three Tiers, network coverage is offered on the following three terms: (1) beneficiaries enjoy financial incentives to select network providers (*i.e.*, providers in Tiers 1 through 3), such as lower copayments, coinsurance amounts, and/or deductibles; (2) beneficiaries visit healthcare providers in one of the specified networks; and (3) the Plan pays those providers at contracted rates for covered health care.

25. The Yakima Valley Plan also covers services rendered by medical providers who are not part of one of the networks specified in the Plan. On information and belief, the Plan

PLAINTIFF'S COMPLAINT - 6
CASE NO. 2:19-cv-302

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

provides "out of network" (or "non-network") coverage for healthcare services, on the following three terms: (1) Plan beneficiaries face financial disincentives to select non-network providers, including higher copayments, coinsurance amounts, and/or deductibles, along with the responsibility to pay any charged amounts not paid for by the Plan; (2) beneficiaries visit healthcare providers of their choosing; and (3) the Plan pays non-network providers a percentage of the covered expenses provided by non-network providers. For most covered services, the percentage paid by the Plan to non-network providers is lower than the corresponding percentage paid to network providers.

26. The Plan defines different reimbursement rates for non-network providers depending on whether the services in question were rendered in Washington. In-state, non-network services are reimbursed based on a fee schedule provided by First Choice.

27. The Defendants, however, applied an entirely separate, and lower, payment regime only to dialysis services provided to patients with ESRD. The Plan's language is stark: With respect only to patients with ESRD, it provides that, "[o]nce the member becomes, or is eligible to become, qualified for Medicare coverage for ESRD and Medicare becomes or is eligible to become the secondary payer for ESRD services, the Plan will pay claims for ESRD services at 125% of the then current Medicare allowable for ESRD Services."[2]

28. On information and belief, the "current Medicare allowable" amount is set by the federal government to define the government's payor obligation. It is significantly lower than rates defined by private payers' fee schedules or the usual and customary ("UCR") rates DaVita and other providers typically receive. By basing reimbursement on the "Medicare allowable," Defendants have cordoned off ESRD patients and drastically reduced their dialysis benefit, as compared to other dialysis patients.

---

[2] For ESRD patients "not yet eligible to enroll in Medicare," benefits are provided consistent with the Plan's default settings described above: Such claims "are paid at applicable network or negotiated fee at in-network or out-of-network benefit levels as indicated in the Summary of Medical Benefits."

PLAINTIFF'S COMPLAINT - 7
CASE NO. 2:19-cv-302

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

29. This improper plan design puts unacceptable pressure and risk on the Plan's ESRD beneficiaries, whose lives literally depend on the care DaVita provides. DaVita cannot treat patients indefinitely without appropriate compensation—nor will any other dialysis provider. If defendants' unlawful conduct persists, providers may eventually choose not to treat Plan beneficiaries. Or they may be forced to require Plan beneficiaries to shoulder some or all of the shortfall between the Plan's improperly low rate and the rates typically received from private payers. Defendants have thus jeopardized the lives and livelihoods of the Plan's most vulnerable beneficiaries.

### III. The Plan Has Underpaid DaVita For Health Care Provided To At Least One Beneficiary.

30. DaVita provides dialysis services to at least one beneficiary of the Yakima Valley Plan (referred to as Patient 1 to protect their privacy).[3]

31. When Patient 1 began treatment in 2016, Patient 1 effectuated a valid assignment of benefits by executing a "Patient Acknowledgment, Authorization and Financial Responsibility Form" ("Assignment") to DaVita. Patient 1 has reaffirmed the Assignment annually since then, executing Assignment forms in 2016, 2017, and 2018. The Assignment gives DaVita the right to be paid directly for any services rendered to Patient 1, and also entitles DaVita to assert Patient 1's legal rights under any applicable law. These legal rights include the right to recover benefits, to file claims and appeals, to request and obtain information and documents relating to the plan, and to bring suit for violations of any applicable law. The Assignment also appoints DaVita as Patient 1's "authorized representative."

---

[3] In an abundance of caution and out of concern for patient privacy, DaVita has not pleaded details about Patient 1's dates of service (other than year), treatment facilities or other identifying information. DaVita is willing to supply Defendants additional reasonable information to identify the patient. DaVita will supply information upon Defendants' request, but only in a manner that complies with all federal and state privacy laws.

PLAINTIFF'S COMPLAINT - 8
CASE NO. 2:19-cv-302

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

32.  After providing treatment to Patient 1, DaVita sought payment from the Plan. DaVita did so by submitting the necessary information via the standard "UB-04" form, indicating, *inter alia*, the dates of treatment for which DaVita was seeking payment and the particular treatment provided. Each UB-04 also indicated that DaVita had obtained an assignment from Patient 1.

33.  For the first three months of service, DaVita received appropriate reimbursement through First Choice, the Plan's third-party claims administrator. That reimbursement was consistent with the Plan's generally applicable benefits and reimbursement provisions.

34.  Beginning in month four, however, Defendants drastically reduced the benefits provided to Patient 1, and, in turn, the reimbursements provided to DaVita, to the Medicare-based rates the Plan applies only to ESRD patients. Those rates were far less than either the rate provided in First Choice's fee schedule for in-state non-network providers or the usual and customary rates DaVita typically receives.

35.  Although DaVita continued to submit claims to the Plan as it had done during Patient 1's first three months of treatment, the Plan continued to pay the reduced, Medicare-based rates for the next 20 months. All told, the Plan has failed to pay DaVita at least $1.7 million.

36.  At that point, Patient 1 switched from the Plan to Medicare for primary coverage for dialysis treatments. At the time of the switch, ten months remained in the 30-month "coordination period" during which the MSPA requires the Plan to be Patient 1's primary payer. In other words, Defendants did not simply design a reimbursement scenario intended to push ESRD patients from the Plan to Medicare; they actually succeeded in pushing at least one patient to Medicare during the MSPA-required coordination period.

PLAINTIFF'S COMPLAINT - 9
CASE NO. 2:19-cv-302

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

## COUNT ONE

### *Against All Defendants*

(*Double Damages Under the MSPA*)

37. DaVita re-alleges each paragraph of this Complaint as if fully set forth herein.

38. By structuring the Plan to reduce the benefits available to ESRD patients, Defendants have violated the MSPA. Medicare covers all individuals with ESRD, regardless of age or financial resources. However, the MSPA mandates that, for the first 30 months of Medicare eligibility, the individual's private insurer must continue to cover the individual's ESRD care as the primary payer. 42 U.S.C. § 1395y(b). The MSPA prevents insurers from shirking this payment responsibility and prematurely shifting patients to Medicare. *Bio-Medical Applications*, 656 F.3d at 282-83. It does so in two key ways.

39. First, the MSPA prohibits an insurer from "tak[ing] into account that an individual is entitled to or eligible for" Medicare based on ESRD. 42 U.S.C. § 1395y(b)(1)(C)(i). Binding regulations explain that this includes "[i]mposing limitations on benefits for a Medicare entitled individual that do not apply to others enrolled in the plan, such as providing less comprehensive health care coverage, excluding benefits, [or] reducing benefits." 42 C.F.R. § 411.108; *see id.* § 411.161(a). This provision is primarily designed to prevent insurers from causing individuals with ESRD to shift onto Medicare before the 30-month "coordination period" expires. *See Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 414 n.2 (D.C. Cir. 1994) ("If a plan is written in ways that impermissibly 'take account of' beneficiaries' eligibility for Medicare, the MSP statute works to extend the plan's coverage beyond its own terms.").

40. Second, the MSPA prohibits an insurer from "differentiat[ing] in the benefits it provides between individuals having end stage renal disease and other individuals covered by such plan on the basis of . . . the need for renal dialysis, or in any other manner." 42 U.S.C.

PLAINTIFF'S COMPLAINT - 10
CASE NO. 2:19-cv-302

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

§ 1395y(b)(1)(C)(ii). This provision is primarily designed to prevent discrimination against individuals with ESRD.

41. Here, Defendants' conduct violates both prohibitions. By its express terms, the Plan provides worse "benefits for outpatient kidney dialysis for treatment of ESRD" than for other dialysis treatment. And it does so when a "member becomes, or is eligible to become, qualified for Medicare coverage for ESRD and Medicare becomes or is eligible to become the secondary payer for ESRD services."

42. As a result, Defendants' conduct simultaneously takes into account the fact that beneficiaries like Patient 1 are eligible for Medicare based on ESRD and differentiates the benefits provided to ESRD beneficiaries from those provided to all others.

43. Not only does this arrangement discriminate against ESRD individuals; it is designed to induce them to simply drop out of the Yakima Valley Plan and instead rely on Medicare. The reason: Plan beneficiaries with ESRD receive benefits based on a less generous formula than Plan beneficiaries who do not have ESRD. This discriminatory plan design leaves Medicare-eligible ESRD individuals facing enormous additional payment obligations not faced by others on the Plan which, in turn, incentivizes them to leave the Plan in favor of Medicare during the coordination period, as Patient 1 did in this case. This is precisely what the MSPA was enacted to prevent. *See Bio-Medical Applications*, 656 F.3d at 282-83.

44. Defendants' MSPA violation entitles DaVita to double damages under the MSPA's "enforcement" provision, which establishes "a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A)." 42 U.S.C. § 1395y(b)(3)(A).

45. This cause of action permits "a private party . . . to bring suit in the party's own name to remedy the wrong done to it" under the MSPA. *Woods v. Empire Health*, 574 F.3d 92,

PLAINTIFF'S COMPLAINT - 11
CASE NO. 2:19-cv-302

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

98-99 (2d Cir. 2009); *see Netro v. Greater Baltimore Med. Ctr. Inc.*, 891 F.3d 522, 527-28 (4th Cir. 2018); *In re Avandia*, 685 F.3d 353, 359 & n.9 (3d Cir. 2012) (collecting cases explaining that the MSPA cause of action remedies private injury, not injury to the government). The cause of action contemplates suits both by plan beneficiaries and by healthcare providers like DaVita in their own right. *See Parra v. PacifiCare of Ariz.*, 715 F.3d 1146, 1152 (9th Cir. 2013); *Mich. Spine & Brain Surgeons v. State Farm*, 758 F.3d 787, 790 (6th Cir. 2014); Centers for Medicare & Medicaid Services, *Medicare Secondary Payer Act Manual*, ch. 1 § 30.B ("claimants" who may sue under the MSPA include "a beneficiary, provider, physician, or supplier").

46. Here, the Plan's failure to make required primary payments has injured DaVita by depriving it of more than $1.7 million that it would have received had the Plan continued to pay as required. The MSPA cause of action thus entitles DaVita, both in its own right and as assignee of Patient 1, to recover double this amount in damages.

## PRAYER FOR RELIEF

WHEREFORE, DaVita prays for judgment against Defendants as follows:

1. For equitable relief and monetary relief, in an amount to be proven at trial, including double damages under the MSPA, plus all applicable interest and costs;

2. For all attorneys' fees and costs incurred in bringing this action, to the extent recoverable by law;

3. For an order declaring DaVita's rights and enjoining Defendants from continuing their illegal practices; and

4. For all other relief the Court deems appropriate, proper, and just.

PLAINTIFF'S COMPLAINT - 12
CASE NO. 2:19-cv-302

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

DATED: March 1, 2019

By: *s/ Erin M. Riley*
Erin M. Riley, WSBA #30401
eriley@kellerrohrback.com

By: *s/ Gretchen S. Obrist*
Gretchen S. Obrist, WSBA #37071
gobrist@kellerrohrback.com

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
T: (206) 623-1900 | F: (206) 623-3384

By: */s/ Peter K. Stris*
Peter K. Stris, *pro hac application to be filed*

By: */s/ Brendan S. Maher*
Brendan S. Maher, *pro hac application to be filed*

By: */s/ Michael Donofrio*
Michael Donofrio, *pro hac application to be filed*

**STRIS & MAHER LLP**
725 S. Figueroa Street, Suite 1830
Los Angeles, CA 90017
T: (213) 995-6800 | F: (213) 261-0299

Attorneys for Plaintiff DAVITA INC.

PLAINTIFF'S COMPLAINT - 13
CASE NO. 2:19-cv-302

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384